UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 4:25cr52

CHAPELLE BOULDIN,

### OPINION AND ORDER

This matter is before the Court on defendant Chapelle Bouldin's ("Defendant") motion to dismiss Count Four of his indictment and motion to suppress evidence. ECF Nos. 10, 11. The United States responded opposing both motions, ECF No. 19, and Defendant did not file a reply. A suppression hearing was held on December 8, 2025, and the parties thereafter filed supplemental briefs. ECF Nos. 23, 24. For the reasons set forth below, both of Defendant's motions are **DENIED**.

### I. MOTION TO DISMISS

In his motion to dismiss Count Four of the indictment, Defendant claims that 18 U.S.C. § 922(g)(1) "is unconstitutional on its face and unconstitutional as applied to Mr. Bouldin." ECF No. 10, at 1. However, as Defendant readily acknowledges in his filing, his challenges to § 922(g)(1) are foreclosed by Fourth Circuit precedent. Id. (explaining that the motion was filed "to preserve the issues for later review"); see United States v. Hunt, 123 F.4th 697, 702 (4th Cir. 2024) (holding "that Section 922(g)(1)

remains facially constitutional" and that Fourth Circuit "precedent foreclos[es] as-applied challenges" to the same provision). Accordingly, the Court **DENIES** Defendant's motion to dismiss Count Four of the indictment. ECF No. 10.

## II. MOTION TO SUPPRESS

### A. Factual Background

The parties have introduced police body camera (hereinafter "bodycam") footage from three different perspectives, and therefore the material facts are largely undisputed. Shortly after 8:00 p.m. on April 8, 2025, Newport News Police Officer Jarrod Goodnight witnessed Defendant failing to stop at a stop sign and making an illegal right turn. Officer Goodnight used his police radio to contact a supervisor who confirmed Goodnight's recollection that Defendant's vehicle matched the description of a vehicle associated with potential drug trafficking. Officer Goodnight then radioed for assistance. Another Newport News officer in the area, Officer Michael McKay, received Officer Goodnight's call and pulled Defendant over.

As reflected in the bodycam footage, Officer McKay approached Defendant's vehicle from the passenger side and asked for his license. Defendant provided a photo ID, a temporary paper driver's license, and his registration. Less than a minute and 20 seconds after Officer McKay started speaking with Defendant, Officer Goodnight arrived at the driver's side window of Defendant's car.

Officer Goodnight immediately noticed that Defendant's belt on his pants was undone and asked him about it; Defendant stated that he always drives that way, but his sentence trailed off.[1] Officer Goodnight then spoke with Defendant for approximately 90 seconds with Officer McKay standing by. During this conversation, Defendant was very talkative and explained that he was recently pulled over by another officer in the same location. Officer Goodnight patiently listened to Defendant and then explained the driving infractions that he just witnessed. Officer McKay, who had Defendant's license and other paperwork, then returned to his police vehicle to perform record checks.

Officer Goodnight spoke with Defendant for approximately three minutes while Officer McKay was in his vehicle using his police computer. During this time, Defendant remained quite talkative, continuing to complain about the prior traffic stop. In a patient and professional manner, Officer Goodnight provided Defendant detailed advice about his right to file a complaint about the prior stop if he wished to do so. During this conversation, a third Newport News Officer, Officer Marco Antonio Segurra, arrived.

---

[1] Officer Goodnight's subsequent written report and his testimony at the suppression hearing both identify the undone belt as odd or unusual. Following Defendant's arrest, Defendant was determined to have hidden narcotics in his rectal cavity.

Less than six minutes into the stop, Officer Goodnight told Defendant to "hang tight for me," and walked back to Officer McKay's vehicle. With Officer Segurra also standing near Officer McKay's vehicle, Defendant was briefly left alone in his car.[2] Officers McKay and Goodnight then had a short exchange, with Goodnight interpreting one of McKay's questions as asking whether Goodnight and Defendant discussed the potential presence of guns or narcotics in the car. Because Officer Goodnight said that he had not, Officer McKay said that he would address the subject.

At this point (the six minute mark of the stop), Officer McKay walked up to the driver's side of Defendant's car and said, "Hey Mr. Bouldin, can I talk to you real quick out here?" Defendant then opens his car door (which he leaves open) and steps out. During the next two minutes, Defendant and Officer McKay talked near the driver's side rear taillight.[3]

Officer McKay began by telling Defendant that he was "good on the driver's license," but that Officer McKay was aware of Defendant's history of narcotics distribution. Defendant, who

---

[2] Officer Goodnight credibly testified that he felt comfortable leaving Defendant alone because he interpreted Defendant's talkativeness about the prior traffic stop as Defendant trying to distract the officers from the current situation. At the time Officer Goodnight left him alone, Goodnight wanted Defendant to believe that his distraction technique had succeeded.

[3] During this time, Officer Goodnight performed a plain view sweep of the passenger side of Defendant's car while Officer Segurra did the same on the driver's side. Officer Segurra's plain view sweep (using his flashlight) lasted less than 30 seconds, whereas Officer Goodnight swept the passenger side (also with a flashlight) for over a minute before he moved to the driver's side to briefly recheck the area that Segurra had checked.

4

remained talkative and was laughing near the beginning of the conversation, said that his narcotics history was "old" and he served 10 years in federal prison.

Officer McKay then asks Defendant (about 30 seconds into the conversation) "Do you have anything on you" and Defendant responds, "no sir." Officer McKay then asks "Do you have anything inside the car" and Defendant responds "no, I shouldn't be getting a search or anything because that is illegal" – to this, McKay responds "I'm just asking you questions." Defendant then says, "I understand, but there's no reason to search me or anything like that because I have not done anything but a stop sign." Officer McKay then indicates that he did not get to that point yet (apparently referencing his intent to ask about consent).

With Defendant starting to become somewhat agitated, Officer McKay made some comments that appear to be directed at keeping the temperature down, stating "I'm just saying dude, just because you had the history pop up," and then he goes on to indicate that "sometimes people go back to that sort of lifestyle." Defendant again suggests annoyance, and Officer McKay again makes a conversational comment seemingly to reassure Defendant, saying that he is not doubting Defendant but is just doing his due diligence. Defendant then asks (about 1 minute and 30 seconds into the conversation) whether the officers can just finish up the traffic stop. At the same time, Officer Goodnight comes around to

the driver's side of Defendant's vehicle, and Officer McKay points to Goodnight and indicates to Defendant that whether a traffic ticket will be issued is up to Officer Goodnight "because he is the one that observed everything." Defendant then turns away from Officer McKay and asks Goodnight a question, with Goodnight referring Defendant back to McKay.

At this point, just under two minutes after Defendant was asked to step out, Officer Goodnight signals to McKay that Defendant <u>should be taken into custody</u>.[4] Officer McKay, having missed the signal, for the first time affirmatively asks for consent to search, stating: "You're saying we can't search to make sure that you don't have anything on you?" Defendant says "No, because that is against my - that is against the law brother." Just as Defendant says "brother," Officer Goodnight begins to handcuff Defendant. After Defendant is handcuffed, Officer Goodnight takes Defendant to the driver's area and explains that while he was looking through the open door with his flashlight he saw reflective rocks that, based on his 14 years of experience, appear to be cocaine.

---

[4] At this same moment, Officer McKay mistakenly hands Defendant his documents back. Officer McKay testified that this was a "mistake" because Officer Goodnight would need the documents to process the traffic infraction. The Court fully accepts the characterization of this act as a mistake as all three officers testified credibly at the suppression hearing. The action of returning the documents, even if mistaken, suggests that Officer McKay was completing his conversation with Defendant.

The remainder of the bodycam footage is not material to the suppression motion, and it is undisputed for the purposes of this motion that Defendant was ultimately arrested and searched, as was his vehicle, and that narcotics and a firearm were recovered. Subsequently, a federal grand jury returned a four-count indictment charging Defendant with two drug trafficking felonies and two firearm felonies.  ECF No. 1.

### B. Procedural Background

Defendant's motion to suppress does not challenge the lawfulness of the traffic stop itself.  Instead, Defendant contends that the lawful traffic stop was unlawfully extended when Officer McKay asked him to step outside of his vehicle and questioned him about narcotics.  ECF No. 11, at 1.  Defendant further argues that the officers lacked reasonable suspicion to extend the scope of the stop and that the "good-faith exception to the exclusionary rule should not apply."  Id.

In response, the Government does not argue that the officers had reasonable suspicion to extend the stop to investigate other crimes, nor does it invoke the good faith exception.  See United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018) ("The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure.").  Rather, the Government argues that the "eight minute traffic stop was not unreasonably prolonged for impermissible reasons" because the stop was efficiently conducted

7

and the officers "only questioned the defendant about his criminal history to ensure officer safety." ECF No. 19, at 1. Although the Government does not assert that the officers had reasonable suspicion, it does effectively highlight that multiple case-specific facts (including Defendant's history of narcotics and firearm offenses, the fact that he was very talkative and sought to distract officers, the fact that his belt and pants were undone, and the information suggesting that Defendant might have recently returned to drug trafficking "raised concerns about the possibility that the defendant could become violent or that he might have a firearm." Id. at 5.

### C. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a seizure under the Fourth Amendment and therefore must be reasonable." United States v. Hawkins, 161 F.4th 242, 246 (4th Cir. 2025) (citing Rodriguez v. United States, 575 U.S. 348, 355 (2015)). A traffic stop qualifies as reasonable if "(1) the stop is legitimate at its inception and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop." United States v. Perez, 30 F.4th 369, 375 (4th Cir. 2022) (citing Terry v. Ohio, 392 U.S. 1 (1968)). Here, only the

second prong of the test is relevant as Defendant does not challenge the legitimacy of the initial stop.

Evaluating the reasonableness of officers' actions during a traffic stop depends heavily on the circumstances. There is no bright-line rule defining the acceptable length of a stop; instead, reviewing courts must evaluate "'what the police in fact do,' and whether the officers acted reasonably under the totality of the circumstances presented to them." United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (quoting Rodriguez, 575 U.S. at 357); see United States v. Howell, 71 F.4th 195, 202 (4th Cir. 2023) ("The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision . . . ." (quoting United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008)). Law enforcement officers are not required to "employ 'the least intrusive means conceivable' in executing a stop, but [they] still must be reasonably diligent and must use 'the least intrusive means reasonably available.'" Hill, 852 F.3d at 381-82 (emphasis added) (quoting United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016)).

When applying this totality of the circumstances test, controlling law distinguishes between investigative techniques that fall within the mission of the traffic stop and those techniques that constitute a "detour" into an investigation of unrelated criminal activity. On-mission inquiries germane to the

traffic stop include both "'ordinary inquiries incident to the traffic stop'" and inquiries that fall under the umbrella of "officer safety." Rodriguez, 575 U.S. at 356 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)).

"Ordinary" inquiries include checking a driver's license, registration, and proof of insurance, and performing warrant checks. Id. Officer safety inquiries include performing a criminal record check, asking a driver to step out of the vehicle, and asking whether there are weapons or anything dangerous in the vehicle. See Palmer, 820 F.3d at 649; Rodriguez, 575 U.S. at 356; United States v. Buzzard, 1 F.4th 198, 204 (4th Cir. 2021). While reasonable safety checks do not constitute a detour from the traffic-based detention, "an officer's focus must remain on the bases for the traffic stop, in that the stop must be 'sufficiently limited in scope and duration to constitute a lawful investigative seizure.'" Palmer, 820 F.3d at 649 (quoting United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011)). Because roadside stops are fundamentally "fraught with danger to police officers," citizens must tolerate "negligibly burdensome precautions" to protect officer safety, including answering questions about weapons and "exit[ing] the vehicle" during the stop if asked to do so. Rodriguez, 575 U.S. at 356 (citation omitted).

In contrast, the paradigm shifts when the objective facts reveal that officers detoured from a traffic-based seizure. The

United States Supreme Court's <u>Rodriguez</u> opinion commands that citizens need not endure even a <u>de</u> <u>minimis</u> intrusion on their personal security <u>if</u> it occurs due to a detour to investigate other crimes. <u>Id.</u> at 356-57; <u>see</u> <u>Hill</u>, 852 F.3d at 381 ("<u>[E]xtending</u> a stop by even a <u>de</u> <u>minimis</u> length of time [in order to conduct an unrelated investigation] violates the Fourth Amendment.") (emphasis added).[5] Off-mission detours that extend a traffic stop <u>beyond the time</u> reasonably necessary to complete it are impermissible because when they occur, the justification for the <u>extended seizure</u> is untethered to the police-witnessed traffic violation.[6]

The majority opinion in <u>Rodriguez</u>, to put it mildly, creates an exacting rule.[7] However, the strict prohibition on <u>de</u> <u>minimis</u> extensions applies only when police officers unreasonably veer <u>off</u> <u>task</u>, and in doing so, "measurably extend" a traffic stop such that it is longer than reasonable. <u>See</u> <u>Perez</u>, 30 F.4th at 375 (rejecting the defendant's claim that "the officers abandoned the

---

[5] This rule applies both to <u>de</u> <u>minimis</u> burdens caused by investigative detours and to "safety precautions taken in order to facilitate such detours." <u>Rodriguez</u>, 575 U.S. at 356.

[6] As <u>Rodriguez</u> compels, if a traffic stop is completed, or delayed beyond the point it should have been completed due to an unrelated investigation, there must be an independent justification for any prolonged detention. Two permissible justifications for a prolonged detention are "consent from the individuals detained" or "reasonable suspicion" that other crimes are being committed. <u>Hill</u>, 852 F.3d at 381.

[7] The <u>Rodriguez</u> standard was not developed by a unanimous Court, and the composition of the Supreme Court has changed since it was decided.

main purpose of the stop and prolonged it for the canine unit to arrive," finding instead that the overall "length of the stop was reasonable" based on the case-specific facts).  Tellingly, in Rodriguez, the officers had completed their traffic mission but delayed releasing the defendant to perform a dog-sniff as part of a drug investigation.  Clearly, this unrelated investigation occurring after the traffic stop had ended "extended" the seizure beyond the time reasonably necessary.  Similarly, as established by Fourth Circuit precedent decided before and after Rodriguez, investigative techniques occurring in the middle of a traffic stop can become an unconstitutional detour if they extend the overall length of the stop beyond the time reasonably necessary to complete the traffic mission, such as when the officers "abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation or where the unrelated questions constituted the bulk of the interaction between the police officer and the defendant."  United States v. Digiovanni, 650 F.3d 498, 508-09 (4th Cir. 2011) (internal quotation marks omitted), abrogated in part by Rodriguez, 575 U.S. at 357; see Perez, 30 F.4th at 375 (explaining that "[t]he critical question" is whether, at the time a detour occurred, the "tasks tied to the traffic infraction [we]re—or reasonably should have been—completed") (quoting Rodriguez, 575 U.S. at 354, 357).

Synthesizing this law, while Rodriguez establishes an exacting standard indicating that even a de minimis extension of a traffic stop beyond the time reasonably necessary to complete it violates the Constitution, Rodriguez did not squarely address when mid-stop questioning crosses the line into a "detour," nor does it squarely address when mid-stop questioning can be said to "lengthen" the stop. Tellingly, not every delay or potential delay is a constitutional violation. See Perez, 30 F.4th at 376 (explaining, post-Rodriguez, that while "the stop could have been shorter (and begun more efficiently), it wasn't impermissibly prolonged"); Hill, 852 F.3d at 382 (finding that absent objective evidence of a delay, a "two-minute time difference, between the estimated time required to complete the officers' described activities and the total length of the stop," did not support an inference that Rodriguez was violated).

Post-Rodriguez, the Fourth Circuit has continued to draw a distinction between fact patterns challenging officers' conduct occurring after a stop was or should have been completed and those challenging conduct occurring "during a lawful traffic stop." Buzzard, 1 F.4th at 204 (emphasis in original). Tellingly, in United States v. Bowman, 884 F.3d 200 (4th Cir. 2018), the Fourth Circuit explained as follows:

> The Fourth Amendment permits an officer to conduct an investigation unrelated to the reasons for the traffic stop as long as it "[does] not lengthen the roadside

detention." Rodriguez, 575 U.S. at 354 . . . . For
instance, police <u>during the course of a traffic stop</u> may
question a vehicle's occupants on topics unrelated to
the traffic infraction, <u>see</u> <u>Arizona v. Johnson</u>, 555 U.S.
323, 333 (2009), or perform a dog sniff around the
outside of a vehicle, <u>see</u> <u>Caballes</u>, 543 U.S. at 409, as
long as the police do not "extend an otherwise-completed
traffic stop in order to conduct" these unrelated
investigations, <u>Williams</u>, 808 F.3d at 245. But, as noted
previously, a traffic stop becomes unlawful when it is
prolonged beyond the point at which "tasks tied to the
traffic infraction are—or reasonably should have been—
completed," Rodriguez, 575 U.S. at 354, even if only for
a <u>de minimis</u> period of time, <u>see</u> <u>id.</u> at 355-56.

<u>Bowman</u>, 884 F.3d at 210 (emphasis in original).

To the extent that other circuits have read <u>Rodriquez</u> to
require exacting scrutiny of exceedingly brief verbal exchanges
occurring in the middle of still-in-progress traffic stops, not
only is such out-of-circuit law not controlling, but adopting such
a rule has the potential to undermine officer safety and lead to
consequences that were never intended by the <u>Rodriguez</u> majority.
<u>See, e.g.</u>, <u>United States v. Ross</u>, 151 F.4th 487, 492 (3d Cir. 2025)
(explaining in a lengthy published opinion, issued after oral
argument, why a <u>five second</u> verbal exchange did not violate
<u>Rodriguez</u>).   This type of onerous scrutiny involving the
interrogation of officers' every word runs the risk of undercutting
officers' ability to be conversational or to de-escalate a tense
and dangerous stop with small talk or friendliness, thereby

14

exacerbating the risk of grave injury that law enforcement officers face each day on patrol.[8]

Acknowledging the palpable risk to officer safety, as well as the fluid circumstances and exigencies to which patrol officers must respond on a daily basis, this Court applies Rodriguez in a manner that provides officers a wide berth to protect their own safety.   This wide berth, of course, cannot be so deferentially defined that it permits strained appraisals of objective facts to twist "officer safety" into a panacea that trumps citizens' constitutional right to be free from unreasonable seizures.   But the proper constitutional standard is always grounded in case-specific reasonableness, and when evaluating officers' conduct "the Supreme Court's decision in Rodriguez does not require courts to second-guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop."   Hill, 852 F.3d at 384.   This is particularly true when there is no suggestion that the officers executed the stop "in a deliberately slow or inefficient manner" in order to enhance an otherwise unrelated criminal investigation.[9]  Id.

---

[8] The risks to seized citizens and members of the public traveling along roadways are likewise increased if officers lack the ability to deftly respond to perceived risks on the roadside through engaging in de-escalating (and somewhat lengthened) conversations.

[9] Investigative techniques (such as a K-9 sniff or questioning) that occur during a stop and largely in parallel with steps reasonably necessary to

15

### D. Discussion

Defendant asserts that his traffic stop was impermissibly extended when the officers investigated drug trafficking without reasonable suspicion, ECF No. 11, at 1, whereas the Government asserts that the questions about Defendant's criminal history and the presence of illegal items did not extend the stop and were permissibly asked "to ensure officer safety." ECF No. 19, at 1. When a defendant points to evidence suggesting that an unconstitutional detour may have occurred, "the government bears the burden of justifying the length of a defendant's detention." United States v. Dadisman, No. 22-4647, 2025 WL 1513604, at *6 (4th Cir. May 28, 2025) (citing Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion); Palmer, 820 F.3d at 654). For the reasons explained below, the Government has demonstrated that Defendant's detention was reasonable in scope and duration.

### 1. Legitimate Safety Inquiry

Here, after reviewing the bodycam footage and hearing live testimony from all three officers, the undersigned left the suppression hearing with high regard for the testifying officers' integrity and professionalism. Although a second-by-second hindsight review reveals opportunities for increased efficiency,

---

complete that traffic stop are permissible because the lawful authority for the seizure generally continues until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." Hill, 852 F.3d at 381 (quoting Rodriguez, 575 U.S. at 354).

the Court finds that the officers individually and collectively exercised reasonable diligence to stay on task of the traffic based mission during the eight minute traffic stop.

To begin, the first six minutes of the stop were delayed, if at all, by Defendant's talkativeness, and the case-specific circumstances clearly permitted the officers to protect their safety and ask Defendant to step out of his vehicle at this point in the stop.  Rodriguez, 575 U.S. at 356 (citing Pennsylvania v. Mimms, 434 U.S. 106 (1977)).   Similarly, it is clear that Defendant's talkativeness and effort to deflect, his history of possessing a firearm in conjunction with drugs, the information potentially linking him to recent drug trafficking, and the fact that his belt and pants were undone created an objective case-specific concern that Defendant may be armed.[10]  Cf. United States v. Davis, 592 F. App'x 143, 144 (4th Cir. 2014) ("It is well established in this circuit that handguns are a tool of the drug trade.").  This concern plainly supported speaking with Defendant away from the driver's seat (physically distancing him from any nearby weapons), looking through the windows and open door of his

---

[10] As noted above, the Government did not seek to demonstrate that the officers had "reasonable suspicion" that Defendant was involved in drug trafficking.

vehicle, and inquiring about whether he possessed any illegal items or would consent to a search.[11]

In finding that Officer McKay's questions about Defendant having "anything on [him]" were part of a safety inquiry, the Court relies not only on the officers' credible testimony, but also on the controlling legal standard that does not require "laser-like precision from an officer" asking a question about illegal items in the car, even if a more appropriate question would have directly referenced "weapons in the vehicle." Buzzard, 1 F.4th at 204. The Court further finds that an officer may permissibly seek consent to search on the heels of a reasonable inquiry addressing illegal items, as asking such a question during the course of a still incomplete traffic stop is not the type of unconstitutional "detour" envisioned by Rodriquez. Rather, "consent" is a well-recognized exception to the rule prohibiting officers from extending a traffic stop to investigate unrelated crimes. See Palmer, 820 F.3d at 649; cf. United States v. Daniel-Dejesus Santos, -- F.4th --, No. 25-1051, 2025 WL 3637861, at *4 (6th Cir. Dec. 16, 2025) ("[A] request [for consent] on its own does not

---

[11] The Court acknowledges that Defendant was outnumbered by the officers during the stop, but the safety inquiry is not reducible to a simple numbers game. Here, particularly due to the fact that Defendant's pants were undone, the Court will not play "Monday Morning Quarterback" to challenge the officers' concern that Defendant may have removed a weapon from his pants and placed it in an easy to access location after the stop was initiated.

impermissibly extend a stop" as it "is itself a request to extend
the stop that a driver may deny.").

Endeavoring to identify the line between a reasonable and
targeted safety inquiry and a foray into an unrelated drug
investigation is not an easy task. Here, however, the Court finds
that the officers did not veer off task to a degree that they
engaged in a "detour" that lost its tether to officer safety.
Rather, during the two-minute conversation outside the car,
Defendant talked almost as much as Officer McKay, and several of
Officer McKay's statements appeared to be directed at ensuring
that the atmosphere stayed friendly and not needlessly accusatory,
thereby deescalating the confrontation and reducing the likelihood
that Defendant would resort to violence.    Moreover, although
Defendant made statements suggesting that he thought a search would
be illegal, based on the way the conversation unfolded, Officer
McKay did not actually ask for consent until the same moment that
Defendant was being taken into custody due to Officer Goodnight's
plain-view discovery.

Accordingly, the Court finds that Officer McKay, though he
likely could have asked his two primary questions (presence of
illegal/dangerous items and consent to search) in a more efficient
manner, still behaved reasonably and stayed sufficiently on-task
during his safety-related inquiry.    See Palmer, 820 F.3d at 649
("A creative judge engaged in post hoc evaluation of police conduct

19

can almost always imagine some alternative means by which the objectives of the police might have been accomplished." (quoting United States v. Sharpe, 470 U.S. 675, 686-87 (1985))). Because the case-specific facts created an elevated concern that a firearm may be present, the Court finds that Officer McKay's questioning, even though unartfully phrased, was reasonably limited in scope and duration and concurrently addressed the officer-safety goal of exploring the presence of firearms. See United States v. Smith, No. 3:22cr90, 2023 WL 25349, at *6 (E.D. Va. Jan. 3, 2023) (finding that after the officer noticed that a bag in the vehicle had been "manipulated" while he was back at his police vehicle, a follow-up inquiry and investigation was a justifiable safety inquiry); Daniel-Dejesus Santos, 2025 WL 3637861, at *1-3 (finding that a forty-second exchange with the driver asking about guns and drugs and requesting consent to search was a permissible safety inquiry, particularly because the passenger was "possibly armed").

Supporting this finding, the Court notes the absence of any objective evidence suggesting that Officer McKay intentionally extended his questioning so that the other officers could visually sweep Defendant's car. Officer Segurra, who was directly in front of Officer McKay, finished his sweep in less than 25 seconds, revealing no obvious need to "extend" the conversation. Although Officer Goodnight swept the passenger side for a longer period and then ultimately "re-swept" the driver's side for about 20 seconds,

the fact that Goodnight chose to do so reveals nothing more than the fact that he was meticulous.[12]  On this record, the Government has demonstrated that the officers did not detour from the tasks related to the traffic stop, and Defendant's motion to suppress is therefore denied.

## 2. Stop was not Extended

Alternatively, the Court finds that even if a detour occurred during the latter portion of Officer McKay's questioning, the stop was not prolonged beyond the time necessary to complete it.  The preliminary records check was completed by the six minute mark, and had Defendant been less talkative about his prior stop, this task would have been concluded earlier.  Additionally, Defendant was taken into custody just over eight minutes into the stop, and at the time he was detained, Officer Goodnight had not yet issued the summons for the traffic violations, a task that plainly would have taken several minutes to complete _after_ he obtained Defendant's paperwork from Officer McKay.[13]

---

[12] This statement is not supposition, but is confirmed by Officer Goodnight's testimony about his activities in this case and his approach to policing, which revealed him to be a detail-oriented patrol officer.  Officer Goodnight's credible testimony further revealed that he swept the driver's side because he did not have Defendant's paperwork, and he was waiting until Officer McKay finished talking with Defendant to both get the paperwork and to speak with Defendant so that Goodnight could decide whether to issue one or two summons(es).  Goodnight, who exhibited an admirable attention to detail, also credibly testified that he generally did not rely on other officer's records checks/searches and performed himself any searches that the law allowed so he could catch things that other officers may have missed.
[13] Officer Goodnight testified that he needed Defendant's paperwork to write the summons(es) and would have reran Defendant's information through his computer to ensure that he had accurate information when doing so.

While it is impossible to determine how long this stop "should" have taken, "the Supreme Court's decision in Rodriguez does not require courts to second-guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop." Hill, 852 F.3d at 384. Here, "though the stop could have been shorter (and [handled] more efficiently), it wasn't impermissibly prolonged." Perez, 30 F.4th at 376. As Fourth Circuit precedent commands, "a traffic stop becomes unlawful when it is prolonged beyond the point at which 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" Bowman, 884 F.3d at 210 (quoting Rodriguez, 575 U.S. at 354). Not only does nothing in the record suggest that the traffic stop reasonably "should" have been completed by the eight minute mark, the objective facts suggest that it reasonably could not have been completed by this time. Even assuming that one of the officers started to write a summons at the six minute mark when the disputed safety-inquiry began, it would be fanciful to suggest that one (or two) summons(es) could have been completed and issued to Defendant in less than two minutes. Cf. Hill, 852 F.3d at 380, 382 (attributing a total of ten minutes to write two summonses in a case where two officers testified that it "typically takes about four or five minutes to write a single summons"); see also Branch, 537 F.3d at 336 ("[T]he appropriate constitutional inquiry is

whether the detention lasted longer than was necessary, given its purpose"); United States v. Puckett, 139 F.4th 730, 739 (8th Cir. 2025) (finding that twenty seconds of questioning about illegal items and consent to search that occurred after an initial records check but before the citation was written did not violate Rodriguez because the trooper "had not completed his traffic-stop related duties" and the questioning did not "prolong the stop beyond the time that it would have taken" to issue a written citation).

Here, even assuming that Officer McKay took too many seconds to affirmatively ask for consent and/or Officer Goodnight took too many seconds to do a safety sweep of the vehicle while awaiting the paperwork he needed to write the summons(es), the Court asks whether this conduct occurred when "tasks tied to the traffic infraction [we]re—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354. The answer to that question is clear— the traffic based seizure would have extended significantly beyond eight minutes even if Defendant had never been asked to step outside of his car, meaning that no constitutional violation occurred in this case. See Dadisman, 2025 WL 1513604, at *6 (indicating that a district court must consider the officers' diligence "during the entire period of detention," which includes consideration of "the length of time typically necessary to complete such a traffic stop," and if "the officers did not detain the defendant longer than the time required to complete the mission

of the traffic stop in a diligent manner, the inquiry ends, and the defendant has not been detained in violation of his Fourth Amendment rights").

### III. CONCLUSION

For the reasons explained in detail above, Defendant's motion to dismiss Count Four of the indictment is **DENIED**, ECF No. 10, and his motion to suppress evidence is **DENIED**, ECF No. 11.

The Clerk is requested to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/

_____
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January  6  , 2026

24